## Clinton H. Randall et al v. Walter Clifford

[122 A2d 833]

February Term, 1956.

Present: **Jeffords, C. J., Cleary, Adams, Chase and Hulburd, JJ.**

Opinion Filed May 1, 1956.

*Reginald B. McShane* for the defendant.

*Lee E. Emerson* for the plaintiff.

**Hulburd, J.** This is an action of tort in which the plaintiffs seek to recover for the alleged careless and negligent digging of a drainage ditch whereby the plaintiffs' springs were destroyed and polluted and their dooryard washed out [count 1]. The plaintiffs further seek to recover damages by reason of the alleged careless and negligent disposal of a dead heifer by the defendant whereby the plaintiffs' springs became contaminated in consequence of which the plaintiffs claim their minor daughter and they, themselves, became sick with damage resulting [count 2].

At the conclusion of the evidence, the defendant moved for a directed verdict on the following grounds: [1] that there was no evidence of negligence on the part of the defendant with respect to either digging the ditch or disposition of the dead heifer; [2] that there was no evidence tending to show that the dead heifer proximately caused any contamination of the water resulting in sickness; [3] that there was no evidence that the plaintiffs have any title to the springs in question.

The trial court granted the defendant's motion as to the second count; as to the first count it limited the plaintiffs to a recovery of damages for the gutting of their dooryard. The jury returned a plaintiffs' verdict on this count.

■■ The court's disposition of the defendant's motion did not conform to the established procedure in this State. A verdict is never to be directed for the defendant if the declaration contains a good count and there is evidence tending to support it. *Zweeres* v. *Thibault*, 112 Vt 264, 270, 23 A2d 529, 138 ALR 1131. The result which the court below sought to accomplish, is to be had by withdrawing the unsupported count from the consideration of the jury. *Yandow* v. *New Amsterdam Cas. Co.*, 101 Vt 322, 324, 143 A 299. Although the procedure adopted by the trial court was inapt, no exception was taken on this ground. The defendant did except, however, to the court's action in entering judgment on both verdicts, one for the plaintiffs and one for the defendant. This obviously presents an incongruous situation and one which illustrates the lack of feasibility of the procedure adopted. Nevertheless, the real question remains: did the plaintiffs have a case for the jury in those respects upon which the trial court ruled against them? To answer this question, it is necessary to examine the evidence in the light most favorable to the plaintiffs.

On Oct. 17, 1945, the plaintiffs, Clinton H. and Doris M. Randall, bought a farm located about four and a half miles from Lyndonville, Vermont. Part of the land was situated in the town of Lyndon and part in the town of Kirby. Like most farms it had its own water supply. It came from twin springs, situated side by side in a grassy ravine in the plaintiffs' field about one hundred fifty yards away from the buildings. Water from one of these springs ran down grade to the barn and from the other to both the house and barn. The springs consisted outwardly of two perforated bottomless barrels sunk in the ground with only a few inches of their tops protruding. They were readily visible and were in existence at the time the plaintiffs acquired title to their farm.

The time came in June 1949 when the plaintiffs decided to sell off a portion of their farm. The prospective customers were a Maurice J. Barber and wife. When Barber came to look the land over in anticipation of buying, the first thing Randall did was to point out where his springs were. The springs were on the portion of land which the Randalls pro-

posed to sell. Barber was told by Randall that he wanted the water rights to his springs and if they went dry he wanted a right to go across the land to some other water rights. The negotiations between the Randalls and the Barbers resulted in a sale and they gave instructions for a deed in accordance with their talk as to what was to be conveyed and what was to be reserved. In this deed dated June 21, 1949, the following language appeared: "Reserving, nevertheless, to the said Clinton H. Randall and Doris M. Randall, and their heirs and assigns, the right to construct a water line across the land hereby conveyed, along a course to be selected by the said Clinton H. Randall and Doris M. Randall, for the purpose of furnishing water to the buildings owned by the said Clinton H. Randall and Doris M. Randall, and the right to repair, relay and maintain said water line, and full and free right and privilege of ingress upon, and egress from, said land hereby conveyed for the purpose of construction, repair, re-laying and maintenance of said water line." Other than the language just quoted there was nothing in the deed relative to springs, water rights, or rights incidental thereto. The scrivener who drew this deed assured the plaintiffs that it saved their spring and spring-rights to them. Without this assurance, the plaintiffs testified they would not have deeded the premises to the Barbers.

Following this conveyance, the plaintiffs selected no course and constructed no new water line; instead they continued to take water as before from the springs they had always used. The Barbers never interfered with this and made no claim to the plaintiffs' springs and spring line at any time after they had bought.

On February 20, 1951, the Barbers conveyed the land which had been deeded to them by the plaintiffs. The deed to them had been duly recorded. The Barbers conveyed to the defendant G. Walter Clifford and his wife, Rita. The deed from the Barbers to the Cliffords contained the following language: "Subject, nevertheless, to that certain reservation in favor of said Clinton H. Randall and Doris M. Randall, their heirs and assigns, of that certain right to construct a water line across the land hereby conveyed, and incidental rights, all as mentioned and described." * * * "Reference

is hereby made to said deed hereinabove mentioned and described, and to all prior deeds and the records thereof, for a more complete and particular description of the land and premises herein granted and conveyed, and of said reservation of a right to construct a water line, and incidental rights, hereinabove mentioned."

Prior to purchasing this real estate, the defendant, Walter Clifford, talked with the plaintiff, Clinton Randall, about it. In the course of a talk concerning the character of the soil, its condition and value, Randall told the defendant he had springs on the land and pointed them out and said he wouldn't want them disturbed. The plaintiff Randall testified about Clifford's replying, "that would come naturally; he figured most any person would know better than that." (The defendant, himself, testified that up until six weeks before the trial he supposed the spring rights were the plaintiffs'.) It was following this talk with the plaintiff, Randall, that the defendant decided to buy and got his deed from the Barbers as stated. After the transfer, the plaintiffs continued to use the same springs as before without interference or any claim on the part of the defendant.

On about the last of May or first of June in 1952, the plaintiff, Clinton Randall, noticed that the defendant was doing some dynamiting in the land that the Barbers had sold him. He went out to investigate and found that the defendant was in the process of making a ditch across the pasture by means of dynamite. As it turned out this ditch was to be about three hundred feet long, four or five wide, and about two feet deep. The ditch was sloped so that it would empty into the same ravine as the plaintiffs' springs. When the plaintiff saw this, he asked the defendant if he didn't figure that the ditch would result in damage to his springs and dooryard which lay below. The defendant replied that he figured he had a right to dynamite on his own land. To this the plaintiff replied that he was probably right, but not to damage another man's property. The plaintiff then suggested to the defendant that he turn the ditch he was making into a different ravine and so avoid this damage. The defendant stated that there wouldn't be water enough from the ditch to do any

harm; so saying, he went about completing the dynamiting of the ditch.

It turned out as the plaintiff had feared; whenever there was a heavy rain, a large flow of water drained into the ravine where the springs were. It washed down on them and continued on down by the plaintiffs' dooryard. What was formerly a grassy ravine was gullied out, the springs were carried away, and with each succeeding rain more and more of the plaintiff's front yard was gouged out and damaged. The percolating water which before had seeped into the spring was replaced by a small brook of surface water which ran muddy at times. One of the two spring lines, that supplying the barn, was put out of operation entirely. The intake to the other line, going to both house and barn, lay in the bed of the brook, with all housing gone. The plaintiffs continued to use the water when mud didn't clog the pipe. At times, after especially heavy rains it had to be pumped clear. When it ran, there was usually water enough for household purposes, but it wasn't used for drinking. So it was during the summer of 1952 and the spring of 1953.

In June of 1953 the defendant had a heifer come up missing. Not long after that date the plaintiffs began to notice that the water had a bad taste. After a little it developed a smell as well. It was the smell of carrion. Members of the plaintiffs' household began throwing up and having diarrhea after drinking the water. When it became apparent that the water didn't taste right, the plaintiffs and their family stopped drinking it, and after a short time their symptoms disappeared. The plaintiff, Randall, inspected the spring and cleaned it out, but, after a day or two, the same smell returned. At this point Randall inquired of the defendant if the lost heifer, which had been found dead, was buried near his water supply. The defendant informed Randall that he thought the heifer was buried in the "run" that fed his water supply. Upon Randall's being provoked at the defendant's failing to let him know, the defendant then stated he thought the heifer had been buried in a different "run". Randall looked into the situation and found that he was able to follow the odor from his spring right up the "run" to a point where the heifer lay

half buried. Water was running through the partly decomposed carcass and on down to the spring. Samples of the water taken from various spots,—at the carcass, midway to the spring, and at the spring,—all showed contamination by intestinal bacteria and that the water was unsafe for drinking. The local health officer being notified of the situation, took steps to have the defendant properly dispose of the dead animal. This was done and the ground where it had lain was disinfected. Tests, however, taken as late as March 1955 still showed the water to be contaminated.

The defendant testified that he never would have told the plaintiffs where he found the heifer and covered her up, if the plaintiff, Randall, hadn't run into him and had a casual conversation with him. The defendant also admitted that he knew that the place where the heifer was found was in the "run" leading down to the spring furnishing the plaintiffs their water.

During the latter part of 1953, after discovery of the dead heifer, plaintiff, Randall, was taken sick with a gastric or intestinal disorder. Randall testified that this trouble was diagnosed by his doctor as para-typhoid fever. Dr. Hill, whom he consulted, did not quite bear out the plaintiff in this statement. It appeared that the plaintiff had been referred by Dr. Hill to a Dr. Johnson for a check for typhoid fever. Dr. Johnson took blood samples and sent them to the State Laboratory for a Weidall test for typhoid. A "weak positive" result was reported. Although the test showed typhoid agglutinations, it did not indicate clinical typhoid fever according to Dr. Johnson, because, as he explained, there are other organisms which give the weakly positive test. In general, it was the doctor's opinion that Randall showed no evidence of serious sickness in spite of his patient's complaints of some intestinal trouble. In any event, plaintiff, Randall, lost some time from his work, incurred medical bills, and suffered resulting damage. For all this expense and that arising from the sickness, of other members of the family, the plaintiffs sought damages under the second count. It is to be noted that the plaintiffs in the second count seek to recover nothing for property damage but only for personal injury.

In passing on the defendant's motion for a directed verdict, the trial court rested its ruling on the third ground advanced by the defendant, namely, that there was no evidence of title to the springs in the plaintiffs. On this ground a verdict for the defendant on the second count was directed by the court, and under the first count it told the jury that no recovery could be had by the plaintiffs for damage to the springs. To all this the plaintiffs excepted and they have briefed five reasons why they claim the court below was in error. The first reason advanced is that the court's action was wrong procedurally. This undoubtedly is true as we have already pointed out, but it is necessary to go further and look into the merits of the controversy in order to see what prejudice, if any, resulted.

The plaintiffs' second ground is a claim that the evidence did show that they had title to the springs. They say, "an appurtenance existed in the plaintiffs, imperfect though it may have been." It will, of course, do the plaintiffs' cause no good to claim an imperfect appurtenance. An imperfect appurtenance is no appurtenance so far as title is concerned. The real question remains: did the plaintiffs have title? To determine this question we must examine the language of the deed itself, because if the instrument is clear and unambiguous, it is to be given effect according to its language, for the intention and understanding of the parties must be deemed to be that which their writing declares. *Davidson* v. *Vaughn*, 114 Vt 243, 246, 44 A2d 144. In such a case where the language is clear and unambiguous, its intent cannot be altered by evidence of extraneous circumstances. *Stratton* v. *Cartmell*, 114 Vt 191, 194, 42 A2d 419. "It is only when the meaning is uncertain that resort may be had to the well settled but subordinate rules of construction to be treated as such and not as positive rules of law." *Davidson* v. *Vaughn*, *supra*, at page 247. The plaintiffs would have us turn immediately to a consideration of extraneous circumstances and the practical construction which they say the parties themselves put upon the instrument in question. This we cannot do until we are confronted with a deed which is uncertain or ambiguous. Accordingly, we consider the deed first.

Earlier in the opinion we quoted the pertinent language used by the plaintiffs when they conveyed. There is nothing about it ambiguous or even abstruse. There is an obvious intent to reserve the right to construct a water line across the land conveyed along a course to be selected by the grantors for the purpose of furnishing water to their buildings. This is all clear, plain, and subject to but one interpretation. It is hard to see how any one could be left in doubt as to its meaning. There is no mention of springs, and obviously no need of one, since the water line is to go *across* the premises as if to reach a spring on land beyond the premises conveyed. There is no mention of existing facilities. The language looks to the future. If the plaintiffs had wished to retain title to facilities in being, a simple statement to that effect would have accomplished the purpose. Whether the word "reserving" or "excepting" had been used, the intent would have been clear from the deed itself and would have been given effect regardless of a failure to use the more appropriate of the two words. *Haldiman* v. *Overton*, 95 Vt 478, 481, 115 A 699. But the plaintiffs did not come even near to saying in their deed what they now would like to claim their intent was. What they said is clear, and it is something else than what they now claim. Oftentimes it is not language which is lacking in clarity, but the mental intent behind it. Human plans and purposes undergo change with time; we are constantly revising our intentions. Unfortunately the expressed intent in a deed is not open to revision to correspond with the present state of mind. We hold that there is no uncertainty or ambiguity in the instruments in question such as to permit resort to extraneous circumstances or evidence of the practical construction of the parties.

It must be kept in mind that we have reviewed the evidence in a light most favorable to the plaintiffs. Such a one-sided process is inevitably calculated here to give rise to a desire toward deed reforming. But the defendant is a third party to the deed from the plaintiffs to the Barbers, and he denies the truth of much that the plaintiffs claim. It was not for the court and jury, in an action of this sort, to embark on an expedition on the seas of chancery. The dynamiting of the ditch presented the plaintiffs with an opportunity to invoke the

aid of equity and thereby test out their claim, and, if success-ful, to have their title to the springs confirmed. Not having formally done so, they should not expect to do it informally in an action of this sort. The ruling of the court below as to the plaintiff's lack of legal title to the springs was proper.

The plaintiffs as a further ground for their position as-sert that the defendant is estopped from claiming lack of title by the plaintiffs to the springs in question. Just how this may be, the attorney for the plaintiffs does not make clear. He points to the fact that when plaintiff, Randall, told the defendant about the springs before the defendant bought, and showed him where they were, that the defendant "agreed to respect the plaintiffs' rights in them." The trouble is that at the time of the statement, the defendant had no knowledge of what the real situation was and in fact continued in that state until six weeks before suit was brought. "An estoppel is something more than an admission." *Smith* v. *Vermont Marble Co.*, 99 Vt 384, 392, 133 A 355. In fact none of the evidence referred to even amounts to an admission. In effect, this is but trying to assert "the practical construction of the parties" in another form. Obviously there was no duty on the defendant up to the time of the alleged causes of action to do anything differently than he did. The cases on estoppel cited by the plaintiffs have nothing in common with the pre-sent situation.

Finally, the plaintiffs maintain that even if they lacked title to the springs, they had rights sufficient to sustain their action. The plaintiffs assert that "the defendant owed them the duty of active care to protect them from injuries from force negligently brought to bear against them, such as the pollution of water the defendant knew they were using." The plaintiffs cite the case of *Watterlund* v. *Billings*, 112 Vt 256, 23 A2d 540. The facts of the case cited are a far cry from the case in hand, but there are cases which, applied to the second count, bear out the plaintiffs' argument. It is well to have in mind the gist of what the second count alleges. We quote enough to give it: * * * "well knowing that the plain-tiffs and their children used the water of said springs for drink-ing and other household purposes, and well knowing that the

carcass of said dead heifer would pollute and poison the waters of said watercourse or brook, did then and there carelessly and negligently bury said dead heifer in the bed of said watercourse or brook, and by means thereof, and without any fault or negligence of the plaintiffs the waters of said brook and springs of the plaintiffs were poisoned and polluted and the health of the plaintiffs and one child was greatly impaired as a result of drinking and using said poisoned and polluted water * * * ". It is to be noted that the gravamen of the charge is that the defendant, knowing that the plaintiffs were *using* the water of the springs in question, wrongfully polluted it unknown to the plaintiffs. This count sets forth an action not for damage to property, the springs, but for damage to person.

In *Long* v. *Louisville* & *N. R. R. Co.*, 128 Ky 26, 107 SW 203, 13 LRANS 1063, one of the defendant's trains had killed a heifer. The section crew under the direction of the foreman buried the carcass on the railroad's right of way. The plaintiff claimed his water supply was contaminated as a result. It was held that there was a case for the jury, the court saying, "—if the defendant wrongfully polluted their spring, they may recover such damages as they have sustained without showing title."

We think that the plaintiff's evidence tended to support the allegations of the second count. Even in the absence of any showing of title by the plaintiffs, the defendant's conduct was fundamentally tortious. Compare *Ploof* v. *Putnam*, 83 Vt 494, 76 A 145. The broad principle laid down by Brett, M. R. in *Heaven* v. *Pender*, 11 Q. B. 503, not always subscribed to, seems to be of sound application here: "Whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."

Under what we have held earlier in the opinion, the plaintiffs cannot recover damages for the springs, not having

title to them, but they are entitled to recover under the second count such damages to the person as may be shown, provided the case is otherwise made out.

For cases on the pollution of water supplies generally, see notes in 55 ALR 1535 and 19 ALR 2d 769.

The defendant claims that the action of the court below in directing a verdict on the second count may be supported on the ground that on the evidence it is conjectural as to whether the spring was polluted from the dead heifer or from surface water generally running into the spring. He argues "that the contamination could have been caused by either the dead animal or the fact that the water drained from utilized pasture land." He points out that two years after the removal of the heifer, tests still showed that the spring was contaminated. It is in evidence, however, that tests taken of the water as it came away from the carcass showed that it was contaminated at that point. Moreover the odor of carrion was traceable from the springs right up to the place the dead heifer lay. We think that there was sufficient evidence so that it was for the jury to say whether the act of the defendant in disposing of the dead animal as he did was a proximate cause of the contamination. The matter of contributory negligence has not been raised so we do not consider it.

What we have said renders it unnecessary to consider the other exceptions briefed. Since the evidence under the second count made a case for the jury, the plaintiffs' verdict rendered did not represent all of the elements of damage which the plaintiffs were entitled to have passed upon. It must, therefore, be set aside in order that the jury may return such a verdict in the case as all the evidence may justify. As was said in *Yandow* v. *New Amsterdam Cas. Co., supra,* at page 324: "This means that the plaintiffs are entitled to a new trial in this case, for there is only one declaration and there is only one case." The effect of what we have held is that the plaintiffs were entitled, on the evidence as presented, to go to the jury under the first count for damages to their dooryard, but not for damages to the springs, while under the second count the

plaintiffs had a case for the jury for injury to the person resulting from the negligent pollution of the springs, and this even though they have not established title to them.

*Both verdicts set aside, judgments reversed and cause remanded.*